STATE OF VERMONT

ENVIRONMENTAL COURT

|  |  |  |
|---|---|---|
| | } | |
| Appeal of Stout | } | Docket No. 211-11- |
| | 04 Vtec | |
| (Rutherford 5-lot PRD) | } | |
| | } | |

Decision and Order

Appellants Anthony and Jill Stout appealed from a decision of the Planning Commission of the Town of Ferrisburgh, approving Appellee-Applicants (Applicants) Ian and Margery Rutherford's proposal for a 5-lot Planned Residential Development (PRD). Appellee-Applicants filed a cross-appeal of conditions 5 and 7 in the approval; the cross-appeal was settled during the pendency of the appeal. Appellants appeared and represent themselves; Appellee-Applicants Ian and Margery Rutherford are represented by Liam Murphy, Esq.; and the Town of Ferrisburgh is represented by James F. Carroll, Esq.

An evidentiary hearing was held in this matter before Merideth Wright, Environmental Judge. A site visit was taken at the conclusion of the hearing, with the parties and their representatives. The parties were given the opportunity to submit written memoranda and requests for findings. Upon consideration of the evidence as illustrated by the site visit, and of the written memoranda and requests for findings filed by the parties,

the Court finds and concludes as follows. To the extent any proposed findings of fact and conclusions of law are incorporated in this decision, they are granted; otherwise, they are denied.

Applicants Ian and Margery Rutherford own 104 acres of land in the Rural Agricultural (RA-5) zoning district in the area of Ferrisburgh known as North Ferrisburgh. The property is located north of the village of North Ferrisburgh and south of Mt. Philo State Park; the Ferrisburgh-Charlotte town boundary forms the northern edge of the property.

The property has been subdivided into an approximately 35-acre parcel that is the subject of the application before the Court, and an approximately 69-acre parcel that includes Applicants' residence and land extending to Lewis Creek.

In the present application Applicants propose to develop the 35-acre parcel as a five-lot Planned Residential Development (PRD). Applicants propose to develop four house lots (Lots 2.2, 2.3, 2.4 and 2.5) on 12.3 acres of the parcel, and to retain ownership of the remaining 22.8-acre parcel (Lot 2.1) of mostly forested land as a conserved open space[1] lot. An earlier proposal for a conventional subdivision of four 5-

---

[1] Applicants propose to conserve this lot by placing it under a conservation easement to be held by the Vermont Land Trust. They also intend to place 56.5 acres of their remaining 69-acre parcel under a conservation easement with the Vermont Land Trust; however, their plans for the additional property are not proposed as part of the PRD now under consideration by the Court.

acre lots was denied due to non-compliance with the frontage requirements, and was not appealed.

Applicants propose to incorporate into their application and to comply with the following conditions as imposed by the Planning Commission in its October 20, 2004 decision, amended as to Conditions 5 and 7 by the parties' stipulation filed with the Environmental Court on April 26, 2005:

1. The proposed dry hydrant will be constructed to Ferrisburgh Fire Department specifications. The construction will be completed before a construction permit for the new dwellings is issued.

---

The additional 56.5 acres of conservation land include meadow, forest and land along an undeveloped segment of Lewis Creek, which the parties and local conservation organizations agree is important to preserve. Because Applicants emphasize that this conservation plan for the additional 56.5 acres of their land "is contingent upon the proposed PRD being approved," we must analyze the proposed conservation portion of the PRD (Lot 2.1) in relation to its effect on and connection with the larger conservation parcel. Applicants' Proposed Findings of Fact and Conclusions of Law, at 7 (May 20, 2005) (proposed finding 28, and see also proposed findings 38 through 41).

2. The road maintenance agreement is approved and on file with the subdivision permit and will be included in the deed language.

3. The road will be constructed as indicated in the road plans and in the letter from the Ferrisburgh Fire Department. The road construction will be certified by an engineer as to meeting the design standards indicated in Exhibit 5.

4. The development roadway and individual driveways will be surfaced with non-white stone.

5. The landscaping for the subdivision and each dwelling shall be installed and maintained in accordance with Exhibit 10 submitted to the Environmental Court, which plan is entitled "RUTHERFORD PROPOSED PRD - Typical Site/Landscape Plan" prepared by LandWorks.

6. All hedgerows will remain undisturbed. The hedgerows to the north and west will be augmented by additional tree plantings to improve screening. Local transplanted trees are suggested; the transplanted trees shall be 8 to 10 feet tall, planted 20 to 30 feet apart and have a mature height of at least 20 to 30 feet.

7. The road improvements and the new road construction for the subdivision will be in place from Mt. Philo Road to the end of the cul-de-sac before an occupancy permit for any of the new dwellings can be issued.

8. All utilities will be underground.

9. The declaration of covenants, easements and restriction on the conserved

land in Exhibit 20 shall be in effect.

10.    All final plats, plans, drawings, testimony and conditions listed above or submitted at the hearings and used as the basis for the decision to grant this permit shall be binding.  The project shall be completed in accordance with such approved plans and conditions.

However, with respect to Condition 10, Applicants have not provided to the Court all of the plans, drawings and other application materials referenced in Condition 10 of the October 20, 2004 Planning Commission decision, either in evidence or in their May 11, 2005 filing of referenced attachments to the Planning Commission decision. (Applicants' Exhibit 12, at 3-4 (internal numbering)).

The proposed areas for wastewater disposal from the four PRD building lots are located on the northerly portion of Lot 2.1 (for the house on Lot 2.5) and on adjacent land of Stearns in Charlotte[2] (for the remaining lots).  Applicants propose to comply with a condition requiring them to obtain all applicable state and local permits required for wastewater disposal.

The terrain of the PRD is gently rolling, generally sloping towards the east and south.  The contour lines shown on Applicants' Exhibits 8 and 9 are not numbered with their respective elevation, and are not consistent with the contour lines as shown on

_____

[2]    The Town of Charlotte has not sought to enter an appearance in the present case to address any legal issues caused by this arrangement.

Applicants' site plan (Applicants' Exhibit 4) or on Applicants' Landscaping Plan (Applicants' Exhibit 10A), which also differ from one another to some extent. However, it does appear from a comparison of these documents and also using the last page of Appellant's Exhibit 6, that the height of land, at an elevation from as much as 300 feet above sea level to somewhat above 280 feet above sea level, extends in a shallow arc from the northwest corner of Lot 2.2 to the southerly edge of Lot 2.3. It also appears that the 280-foot elevation line extends through the building envelope in the northwest corner of Lot 2.4 through the proposed road turnaround, so that the remainder of Lot 2.4 is at an elevation below 280 feet above sea level.

All four of the proposed building lots are located in the meadow. The balance of the meadow is found on the easterly portion of the open space lot: Lot 2.1. The remainder of Lot 2.1 is forested. An intermittent stream, which is a tributary of Lewis Creek, runs from the northeast to the southwest of Lot 2.1, within the forested portion.

The dimensional standards found in §4.2(D[3[3]]) of the Zoning By-laws require a five-acre minimum lot size, and also require a five-acre minimum acreage for each dwelling unit or primary use building. The lot frontage and lot width minimum required by that section is 400 feet, and the lot depth requirement is 450 feet. The maximum building height for the district is 35 feet.

Under §5.21(B) of the Zoning By-laws, to apply for a PRD an applicant must follow

---

[3[3]] Mis-numbered in the Zoning By-laws as a second section 4.2(C).

the procedures for a major subdivision, regardless of the number of proposed lots or house sites, and must provide a "written statement setting forth the nature of all proposed modifications, changes or supplementation of existing zoning regulations" requested for the PRD.  It is possible that such a statement was filed with the Planning Commission but  no such statement has been filed with the Court.  This written statement is important so that the Planning Commission, and hence this Court in this de novo appeal, can rule on the modifications as required by  §5.21(C)(7) of the Zoning By-laws.  Under  §5.21(D)(4) of the Zoning By-laws, a PRD must provide a minimum two-acre lot exclusively associated with each dwelling unit, and must comply with the standards in  §§4.1 and 4.2 of the Zoning By-laws, except for the lot depth requirement.  As best as can be determined from the totality of the submissions in this matter, in connection with the PRD Applicants seem to be requesting[4] modification of the requirements for minimum lot size and minimum frontage found in §4.2(D) of the Zoning By-laws, and otherwise propose that the PRD meets the requirements for minimum acreage per dwelling unit.

---

[4]   Under §150 of the Subdivision Regulations, the Planning Commission also waived the requirements of §§420.3, 420.4, 420.7 and 420.8 of the Subdivision Regulations applicable to the specifications for Braeside Place and its intersection with Highland Way.  (See page 2 of the minutes of the August 18, 2004 Planning Commission hearing, attached to Applicants' Exhibit 3.)

Access to the four house lots from Mt. Philo Road, a public road, is by an existing private road known as Highland Way, which now serves four existing houses including that of Applicants. Highland Way is now at least approximately[5] 1,200 feet in length to the point at which the new road is to intersect Highland Way. While Highland Way has a sixty-foot-wide right-of-way, its traveled way is much narrower; in connection with the proposed PRD, Applicants propose to make improvements to the traveled way of Highland Way, as provided in Condition 3, above. Applicants also propose to construct a new private road known as Braeside Place, 617 feet in length with a cul-de-sac turnaround, leading from Highland Way onto the PRD property.

---

[5] No plan has been provided showing the extent of Highland Way all the way to Mt. Philo Road, or the extent of Highland Way proposed to be upgraded. A plan was provided showing the specifications for the upgrade.

The PRD as now proposed is not shown on any single exhibit. The lots remain as shown on Applicants' Exhibit 4, with house sites as shown on Applicants' Exhibits 8, 9 and 10, and with screening and landscaping as proposed in Applicants' Exhibit 10A. In addition, Applicants propose to require that the houses be oriented with their gable ends (or narrower ends) aligned in an east-west direction, to reduce their apparent bulk when viewed from Appellants' house and from Mt. Philo Road. However, no document appears to require this orientation, nor does anything provided to the Court[6] limit the house size or shape. In addition, the required 50-foot setback from the boundaries of the PRD is not represented on any exhibit and may not[7] be met for the westerly and southerly setbacks on Lot 2.3, the westerly and northerly setbacks on Lot 2.2, and the northerly setback on

---

[6] While it is possible that the septic systems for the houses limit the sizes or number of bedrooms for the houses, and Applicants may intend to limit the houses to 3,500-square- foot, 1½- to 2-story houses, (referred to as "approx. 2 story 3,500 s.f. home" on Lot 2.5 on Applicants' Exhibit 10; shown as 1½- to 2-story houses on the visual simulation in Applicants' Exhibit 11; and as referred to in the August 18, 2004 Planning Commission minutes, at 1 (Applicants' Exhibit 3)), no document provided to the Court includes any such limitation.

[7] The "typical" setback line as shown on Applicants' Exhibit 4 is approximately 25 feet, by scale, around each of the PRD lots, rather than 50 feet at the perimeter of the PRD as a whole. The equivalent unlabeled line on Applicants' Exhibit 10A also scales to 25 feet. The building envelopes on Applicants' Exhibit 10A, and the building footprints on Applicants' Exhibits 8 and 9, do not appear to meet the 50-foot setback, although the "typical" building locations in Applicants' Exhibit 10A do appear to meet the 50-foot setback for the southerly and westerly boundaries of the PRD, as measured by scale on that exhibit.

Lot 2.4.  Applicants have not requested a waiver of this provision for the PRD; accordingly, the building envelopes for these locations must be adjusted to meet this perimeter setback requirement.

The locations of the building envelopes on Lots 2.3 and 2.5 have been moved since the original proposal, so that both houses will be adequately screened from Appellants' view and from Mt. Philo Road by the forest and westerly hedgerow extension and will be seen against a backdrop of existing forest, without affecting the drainage towards Lewis Creek from the wet area in the southeast corner of Lot 2.5.

However, the proposed building envelopes for the houses on Lots 2.2 and 2.4 remain as originally proposed, and are within in the direct line of sight from Appellants' house towards the distant mountains.  If constructed at elevations and to heights consistent with Applicants' visual simulation (Applicants' Exhibit 11), they will not obscure the view of the distant mountains on the horizon, including the view of Camel's Hump, as seen from Appellants' house or from Mt. Philo Road.  The building envelope on Lot 2.2 is located at an elevation below the height of land, although it is on the westerly (Appellants') side of the height of land. If the house is located as close as possible to the northerly hedgerow, and if a dense hedgerow of appropriate species of trees and shrubs is established along the westerly property line of Lot 2.2, and if the house on Lot 2.2 is limited in height to 25 feet and is limited in color to earth tones with a medium to dark earth-toned roof, it will provide an appropriate development plan, adequately screen the

project from adjacent uses, and preserve the scenic qualities of the open land.

The building envelope on Lot 2.4, on the other hand, is not adequately screened by the development proposed for Lot 2.2. Rather, it should be moved towards the east to place it farther below the height of land on Lot 2.4, keeping it close to the northerly hedgerow but out of Appellants' line of sight towards the distant mountains, approximately in the position shown in Appellants' Exhibit 6, last page, as the northwesterly of the two "recommended house sites" on the plan view in that exhibit. This location would provide an appropriate development plan, adequately screen the project from adjacent uses, , and preserve the scenic qualities of the open land, without adversely affecting the forest or the drainage from that lot.

The placement of the building envelopes creates an undeveloped swath of land in the middle of the PRD. It will remain relatively natural in appearance when viewed from Mt. Philo Road and from Appellants' property, and will provide a view corridor towards the easterly forest and distant mountains.

Applicants also propose that the so-called gable ends of the houses within those building envelopes (that is, the narrower end of the houses) will face east-west, so as to present a less obtrusive profile to Appellants' view and the view from Mt. Philo Road. However, this proposal does not appear on any plan provided to the Court or in any proposed condition. Nothing in the proposed conditions would prevent an enormous house to be built on any of these lots, so long as it was located within the building envelope and

met the thirty-five-foot height limitation of the Zoning Regulations. Accordingly, it will be necessary to specify limits on the overall footprint and height, or specify some area-to-height ratio, to provide an enforceable condition to limit the bulk or visibility of the houses at least on Lots 2.2 and 2.4. In the absence of other evidence, the Court will impose[8] a size limit on all the houses of 3,500 square feet in area, as shown as "typical" on Applicants' Exhibit 10A, and will impose a 25-foot height limit on the house on Lot 2.2 and a 30-foot height limit on the house on Lot 2.4.

The forested portions of Applicants' property as a whole represent two natural community types: Floodplain Forest, near Lewis Creek, and a significant area of Clayplain Forest, some of which is on Lot 2.1 of the PRD. Clayplain Forest covered most of the Champlain Valley before land was cleared for farming; however, because the soils typical of this natural community are also excellent for agriculture, much of the original Clayplain Forest in the Champlain Valley has been converted to agricultural use. The forested portions of Applicants' property as a whole are important as wildlife habitat, and as a corridor for wildlife to move between Lewis Creek and the uplands near Mt. Philo. It is important to preserve or restore the remaining patches of Clayplain Forest as a relatively rare natural community type in the Champlain Valley, and to protect the quality of the segment of Lewis Creek adjacent to Applicants' retained land. Lewis Creek is a river of

---

[8] The parties may discuss and propose any alternative limitation on this topic in the proposed judgment order required by this decision.

recognized statewide and regional ecological significance.

Applicants have been managing the Clayplain Forest areas of their property to maintain them or restore them to a more natural condition and to protect the quality of Lewis Creek. The proposed PRD will further this goal by keeping residential development on the four PRD house lots away from the forested area and drainage to the intermittent stream on Lot 2.1, and will enhance the functionality of the Clayplain Forest by maintaining and enlarging the hedgerows on the PRD property, improving the connectivity of the Lewis Creek area to the natural areas on Mt. Philo to the north.

Relative to the preservation of these natural resources, the preservation of agricultural use of the meadow area of the PRD is less important. Even if the meadow were not divided into house lots, its use for hay production is marginally economical, if at all, and is currently being mowed only once a year (or once every other year) late in the summer, under a federal grant to preserve its use for meadow-nesting wildlife. The limitations on mowing and management for native species the meadow area of the PRD, shown as text under the heading "Typical Landscaped Property," must be made a condition of the PRD approval.

The areas directly to the north, west and south of the proposed PRD are developed for single-family residential use, on lots ranging from an acre to ten acres in size, with access from Mt. Philo Road, Old Hollow Road and Champlin Hill Road (in North Ferrisburgh), and from Spear Street Extension (in Charlotte). The areas to the east of the

Proposed PRD remain largely undeveloped. The proposed PRD is consistent with existing development patterns in the area.

Applicants now propose to comply with Applicants' Exhibit 10A as the landscape plan for the proposed PRD. However, this exhibit is presented as a "typical" landscape plan, with "recommended" plants for the hedgerows and recommendations for limitations on mowing and use of native plant species. As it now exists, it is insufficiently specific to be enforceable, either with respect to the plantings required to be installed by Applicants or the planting or maintenance that will be required of the lot owners into the future. Accordingly, to be approved, Exhibit 10A will have to be amended to specify the required locations and density and timing (with respect to the house construction and/or sale of the lots) of the plantings and sizes of plant materials, to be planted in the extended hedgerows near the westerly lot lines of all four lots, and the partial hedgerow on the lot line between Lots 2.3 and 2.2. It will also have to specify the maintenance and replacement requirements for those plantings ; will have to specify the limits of the view corridor in the middle of the PRD (as distinct from the area on each lot within which landscaping would be at the option of the landowner) and specify limitations on the heights and types of plant materials and frequency of mowing allowed within the view corridor to keep the view clear; and will have to specify the limitations of disturbance and mowing on the conservation lot (Lot 2.1).

<u>Street and Road Requirements</u> - Question 4 of the Statement of Questions

The street proposed for the subdivision meets the design standards for dead-end streets in the Subdivision Regulations, as the length of Braeside Place, the dead-end street serving the proposed subdivision, is approximately 617 feet. Section 420.7 of the Subdivision Regulations requires that a cul-de-sac or dead-end street not exceed 1,200 feet in length. Highland Way is not counted in this calculation, as it is an existing private street and not a new street proposed for the new subdivision.

Section 150.1 of the Subdivision Regulations allows the Planning Commission, and hence this Court, to waive requirements of the Subdivision Regulations where there are "special circumstances of a particular plat," as well as due to "extraordinary and unnecessary hardships." While a waiver is not required for the length of Braeside Place, a waiver technically is required to allow Braeside Place to run in a north-south direction rather than in the east-west direction otherwise required by §420.1 of the Subdivision Regulations, as well as for the waivers granted by the Planning Commission and not contested by Appellants, see footnote 4, <u>supra</u>. In the present case the orientation of Braeside Place is desirable to minimize the length of the subdivision street and because clustering and orientation of the roofline of the houses has been used to obtain good solar orientation. However, for this reason as well as to minimize the effect of the development

on Appellants' view and on the view from Mt. Philo Road, the east-west gable end orientation of the houses must be made a condition of approval of this site plan and PRD.

Adequacy of Sewage Disposal - Question 5 of the Statement of Questions

Section 440.6(B) and (C) of the Subdivision Regulations requires that community sewage disposal systems and individual septic systems must meet the requirements of the municipal health regulations. Section 5.21(D)(3) of the Zoning By-laws requires that "adequate sewage disposal facilities" shall be provided for a PRD. Nothing in these sections precludes the location of sewage disposal facilities for a project on adjacent land in an adjoining town. The design and construction of the proposed sewage disposal facilities located in Charlotte may be made a condition of the approval sought in this case, as well as requiring any necessary approval to be obtained from the Town of Charlotte or from the State. However, the question of whether the proposed sewage disposal facilities meet the State's Environmental Protection Rules is not before the Court in the present case[9][9] unless some section of the Ferrisburgh Subdivision Regulations or Zoning By-laws (or separate septic ordinance) requires such compliance; no such section has been found by the Court or called to the Court's attention in this appeal.

_____

[9][9] If state approval is required of the septic system, the Agency of Natural Resources' action on that application would also be appealable to this Court, but would be a new appeal, not a continuation of the present appeal.

The Planning Commission determined that adequate soils for an individual septic system to serve Lot 2.5 are found in the easement area designated for septic disposal on Lot 2.1, near the northern boundary of that lot; and determined that adequate soils for septic systems to serve the houses on Lots 2.2, 2.3, 2.4 are found on land of Stearns adjacent to the PRD property to the north, in the Town of Charlotte. No party provided any evidence to suggest that the soils in those areas are not adequate for septic disposal. Rather, Appellants question whether the proposed sewage systems will meet the Ferrisburgh septic system regulations, and whether the design of the systems located in Charlotte can be enforced.

The proposed sewage disposal facilities have apparently been designed, as they are referred to in Note 4 of the PRD survey plat (Applicants' Exhibit 4) as being found on a "Proposed Lot and Site Plan" and accompanying details prepared by John H. Stuart, Professional Engineer. However, they have not been provided to the Court in the present proceeding, and we cannot determine whether they meet the requirements of the municipal health regulations as required by §§440.6(B) and (C) of the Subdivision Regulations, nor whether they would meet whatever provisions are applicable in Charlotte. Accordingly, with respect to this requirement, the PRD could only be approved subject to a condition that Applicants obtain approval of the septic systems from the Town of Ferrisburgh, together with any approval required by the Town of Charlotte and the State of Vermont, prior to commencement of any site work or construction on the PRD. Appellants and the

Town of Ferrisburgh may qualify to participate in proceedings regarding these approvals; that question is not before this Court at this time. Failure to obtain these approvals would require that Applicants apply for and obtain an amendment of the PRD from the Planning Commission for any alternative proposal for wastewater disposal.

Acreage and Density; Open Space Ownership - Question 2 of the Statement of Questions

To be approved as a PRD, each dwelling unit must have a minimum two-acre lot and otherwise "comply with the specific standards set forth in section 4.1 and 4.2 of these bylaws, excluding the lot depth requirement" as required by §5.21(D)(4) of the Zoning By-laws. The PRD lots are all larger than two acres in area, and the total acreage of the PRD, divided by its four dwelling units, results in an acreage-per-dwelling unit of more than the minimum of five acres required under §4.2(C)(2). The open space land is proposed to be owned by Applicants, under a conservation easement to be transferred to the Vermont Land Trust. Nothing in the Zoning By-laws requires the open space lot to be owned in common by the owners of the house lots, or by an association; rather, §490 of the Subdivision Regulations only requires that the Planning Commission review and approve any management organization set up to operate and maintain any facilities or open space to be held in common ownership. As nothing is proposed to be held in common ownership in this PRD, it does not require any such approval.

PRD Requirements[10] - Question 1 of the Statement of Questions

The purpose of a PRD, as stated in §5.21(A) of the Zoning By-laws, is "to encourage preservation of forestry and agricultural lands by allowing flexibility of design and development of land in such a manner as to promote the most appropriate use of land," as well as to "preserve the natural and scenic qualities of open land." With the changes described in this decision, the proposed PRD meets the requirements of the general and specific standards for PRDs that carry out this purpose statement.

As changed by this decision, the proposed PRD constitutes "an effective and unified treatment of the development possibilities of the site, and . . . makes appropriate provision for preservation of streams, . . . wet areas and unique natural . . . features." §5.21(C)(4). It balances the competing development and conservation needs of the PRD property, and preserves the unique view of the distant mountains, even though Appellants would have preferred that all four houses be placed in the eastern portion of the meadow.

_____

[10] With respect to certain of these requirements, Appellants question whether the project meets the requirements of the zoning ordinance or "as otherwise required by" the former state statute authorizing PRDs, 24 V.S.A. §4407(3). However, nothing in the former state zoning enabling act's provisions authorizing a municipality to adopt PRD regulations superseded the content of those regulations. Compare, 24 V.S.A. §4481(2004).

The proposed open space land of the PRD (Lot 2.1) was "evaluated as to its agricultural, forestry and ecological quality," §5.21(C)(8), both for itself and in relation to its effect on the additional 56.5 acre parcel planned for conservation. The ecological quality of the eastern portion of the PRD property outweighed the agricultural quality of the western portion of the meadow, in determining the appropriate locations for the four building envelopes. As changed by this decision and as discussed above, the proposed PRD preserves the natural and scenic qualities of the open land of the PRD, §5.21(A), and as discussed above, adequately screens the proposed structures from adjacent uses. §5.21(D)(2). Also as discussed above, Applicants will be required to provide their specific requested modifications to the zoning requirements "in terms of standards and criteria for the design, bulk and spacing of buildings and the sizes of lots and open spaces," for incorporation into an enforceable judgment order in this matter. §5.21(C)(7).

Consistency with Municipal Plan - Question 3 of the Statement of Questions

The proposed PRD is "consistent with" the following sections of the municipal plan raised by Appellants, as required by §5.21(C)(1), including the values and policies stated in the "Natural and Cultural Resources" section of the Plan, at pages 24-26.

The Ferrisburgh Town Plan sets as its Goal 1: "to have an active economy while maintaining the agricultural landscape," and as one objective (Objective 1.4) towards reaching that goal: "to promote agriculture and preservation of farmland and other natural

resources." Objective 2.1 of the Plan is "to amend the zoning and subdivision regulations to encourage village type development through the use of Planned Residential/Unit Developments while discouraging the development of open space and productive farmland." Although the Plan emphasizes the agricultural landscape, it also provides for the preservation of other natural resources. The Town's character is described on page 24 of the Plan as "established in the valley setting with large open fields with pockets of woods and forests." The proposed PRD will preserve the relationship of meadow to forest on the PRD property, while keeping the development on the house lots from affecting the open space lot and therefore from impairing the important natural resources planned to be preserved on the remainder of Applicants' land. Moreover, the meadow on the PRD property is only marginally productive, for a single hay crop every year or every other year, merely as a byproduct of preserving the meadow wildlife habitat.

Objective 2.2 is "to work with groups such as the Conservation Committee and the Vermont Land Trust to protect natural resources, open space, farmland and views." Objective 4.3 is "to direct growth to locations that have suitable site conditions where there will be no adverse impacts on important resources, and to be consistent with existing development patterns." The proposed PRD is consistent with existing development patterns and directs growth on Applicants' property to locations that will avoid impacts on the important natural resources represented by the patch of Clayplain Forest on the open space PRD lot, and the forest resources closer to Lewis Creek on the remainder of

Applicants' property.  The proposed PRD, as conditioned by this decision, will also protect the view of the distant mountains from Appellants' property and from Mt. Philo Road.

Based on the foregoing, it is hereby ORDERED and ADJUDGED that the proposed PRD is approved, with the following conditions (originally set forth in the October 20, 2004 Planning Commission decision, as amended by the Stipulation between Applicants and the Town), including the following changes and additional conditions:

1.    (Including original condition 10)    Applicants shall provide a complete set of the plats, plans, drawings, and documents that constitute the final application as presented in Environmental Court and as approved by this Decision and Order, for incorporation into an enforceable Judgment Order in this appeal, resulting in enforceable permit conditions. These documents shall include the written statement required by §5.21(B) of the Zoning By-laws; shall include a plan showing accurate topographical lines, the updated house locations,[11][11] building envelopes, height and color limitations, and required gable-end orientation; shall include all documents referenced in the conditions, to the extent that they differ from[12][12] the documents filed with the Court as exhibits or in the May 11, 2005 filing;

---

[11][11]   Including the adjustments required to show compliance with the fifty-foot PRD perimeter setback.

[12][12]   For example, the plans showing the location of the roadway improvements and the dry hydrant.

and shall include the landscaping plan discussed in Paragraph 6 below. Applicants and their successors and assigns shall complete and maintain the PRD in accordance with such approved plans and the conditions imposed in the Judgment Order; reference to the Judgment Order and approved plans shall be incorporated into the deeds for each of the PRD lots.

2. The proposed dry hydrant shall be constructed to Ferrisburgh Fire Department specifications, and shall be completed before a construction permit for the new dwellings is issued.

3. The road maintenance agreement filed with the Court on May 11, 2005 shall be included in the deed language to each of the PRD lots.

4. The road shall be constructed as shown on the road plans and in the letter from the Ferrisburgh Fire Department filed with the Court on May 11, 2005, and shall be certified by an engineer as to meeting the design standards of Exhibit 5 to the Planning Commission's decision, filed with the Court on May 11, 2005.

5. The development roadway and individual driveways shall be surfaced with non-white stone.

6. The landscaping plan (Exhibit 10A) as submitted to the Environmental Court, entitled "RUTHERFORD PROPOSED PRD - Typical Site/Landscape Plan" prepared by LandWorks, shall be revised to incorporate the following conditions, and to show actual rather than typical planting schemes in accordance with the landscaping and planting

conditions for the subdivision. The revised landscaping plan shall specify planting density and species distribution, including sufficient species with a mature height of 20 to 30 feet, to provide effective screening of the four houses, when viewed from Appellants' residence and from Mt. Philo Road, without growing so high as to block the view of the distant mountains. The revised landscaping plan shall clearly show the limits of disturbance allowed by the permit and shall clearly show the view corridor in the central portion of the PRD, within which the height of landscaping materials is limited, and shall specify the species and/or heights and, if applicable, the mowing frequency and timing, allowed for in the central portion of the PRD; and shall specify the limitations on disturbance of Lot 2.1.

The installation of the landscaping materials required for the hedgerows to the north and west of the PRD property shall be completed in the first available appropriate growing season, or shall be increased in size if planted in a subsequent year to the size to which they would have grown if planted in the initial year. The landscaping and screening materials shall be installed and maintained in accordance with the approved plans. All existing hedgerows shall remain undisturbed. The hedgerows to the north and west of the PRD property, and on the property lines between the lots as shown on Exhibit 10A, shall be augmented by additional tree and shrub plantings to improve screening, to be shown specifically on the revised landscaping plan. Local transplanted trees or nursery stock may be used, but all tree species shall be at least 8 feet tall at planting, shall be planted in the locations as shown specifically on the revised landscaping plan, and shall be replaced

promptly (at the height to which they should have grown in the time from initial planting), if they do not thrive or survive.

7.    The road improvements and the new road construction for the subdivision shall be completed, from Mt. Philo Road to the end of the cul-de-sac, before any occupancy permit for any of the new dwellings may be issued.

8.    All utilities shall be installed underground.

9.    The declaration of covenants, easements and restrictions on the conserved land in Lot 2.1, filed with the Court on May 11, 2005, as Exhibit 20 to the Planning Commission decision, shall be in effect prior to the transfer of any of the building lots.

10.    Applicants shall obtain approval of the septic systems from the Town of Ferrisburgh, together with any approval required by the Town of Charlotte or the State of Vermont, or both, prior to commencement of any site work or construction on the PRD.  Failure to obtain these approvals would require that Applicants apply for and obtain an amendment of the PRD from the Planning Commission  for any alternative proposal for wastewater disposal.

11.     If the anticipated plans to place the 56.5-acre portion of Applicants' remaining property under conservation restrictions does not in fact occur, any party may apply to the Court to reopen this appeal for further consideration of the application's consistency with the Town Plan in regard to the balance between conserving natural resources and preserving the agricultural landscape.

Appellee-Applicants shall file the revised documents required by this decision, together with a proposed Judgment Order, so that they are received by the Court and by Appellants on or before December 21, 2005.  Appellants may file any comments and proposed changes on or before December 29, 2005.

Dated at Berlin, Vermont, this 8th day of December, 2005.

_____

Merideth Wright
Environmental Judge